UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

DM INDUSTRIES, LTD.,                              Case No. 09-15533-BKC-LMI
                                                  Chapter 11 Case

                    Debtor.

_____/

**DEBTOR'S APPLICATION FOR AUTHORITY TO RETAIN
BAYSHORE PARTNERS, LLC AS INVESTMENT BANKER TO THE DEBTOR**
**(HEARING WILL BE HELD ON APRIL 6, 2009 AT 2:50 P.M.)**

DM Industries, Ltd., the above-captioned debtor (the "Debtor")[1], hereby applies for an

order under sections 105, 327(a) and 328(a) of Title 11 of the United States Code, 11 U.S.C. §§

101, et seq. (the "Bankruptcy Code"), and Rules 2014, 2016, and 5002 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the employment and retention of

Bayshore Partners, LLC ("Bayshore")[2], as investment banker to the Debtor (the "Application").

In making this Application, the Debtor has relied on the facts and representations set forth in the

affidavit of Michael F. Turner, a copy of which is attached hereto as Exhibit A (the "Turner

Affidavit").

In further support of this Application, the Debtor respectfully represents as follows:

**Background**

1.      On the date hereof (the "Petition Date"), the Debtor commenced this case upon

the filing of a voluntary petition for relief under Chapter 11, of the Bankruptcy Code in this

Court.

---

[1] The last four digits of the taxpayer identification number of the Debtor is 2370.  The mailing address for the
Debtor is 2320 N.W. 147th Street, Opa-Locka, FL  33054.
[2] Bayshore is the broker-dealer affiliate of Farlie Turner & Co.

2054212-1

2.      The Debtor is a leading manufacturer of luxury hydrotherapy products for indoor and outdoor use.  The Company produces portable hot tubs, swim spas and luxury whirlpool tubs marketed worldwide under the brand names of Vita Spa, Vita Bath, xStream Pro, and Reflection Spas.  The Debtor's headquarters and manufacturing facilities are located in six buildings (with area of approximately 275,000 square feet) in Opa Locka, Florida.

3.      For a more detailed description of the Debtor and its operations, the Debtor respectfully refers the Court and parties in interest to the *Declaration of Eric Dormoy* in Support of First Day Pleadings (the "First Day Declaration") (D.E. No 20).

### Relief Requested

4.      By this Application, the Debtor seeks entry of an order, pursuant to 11 U.S.C. § 327(a) of the Bankruptcy Code and Bankruptcy Rules 2014 and 2016, authorizing Bayshore's retention as investment banker during the pendency of this case, approving the terms under which Bayshore will be compensated pursuant to 11 U.S.C. § 328(a) of the Bankruptcy Code, and the terms set forth in Bayshore's engagement agreement (the "Engagement Agreement"), which is attached hereto as Exhibit B.[4]

### Services To Be Rendered

5.      The Debtor anticipates that Bayshore's services will include the following:

a.      Undertake, in consultation with the Debtor, and its respective advisors, a study and analysis of the business, operations, financial condition and prospects of the Debtor;

b.      Assist in preparing descriptive materials to be provided to potential parties to a potential Transaction (as such term is defined in the Engagement Agreement), which materials shall be reviewed for accuracy and completeness, and approved in writing, by the Debtor;

---

[4] Complete signature pages for the Engagement Agreement will be filed under a notice of filing on Monday, April 6, 2009.

     c.       Assist in identifying and screening potential parties to a potential Transaction;

     d.       Assist in soliciting and evaluating preliminary and final proposals received regarding a potential Transaction;

     e.       Assist in structuring a potential Transaction and negotiating definitive documentation for the potential Transaction;

     f.       Negotiating with key creditors and other constituents as it relates to a Transaction as requested by the Company and its advisors; and

     g.       Participate in court hearings to the extent requested by the Debtor.

6.      The Debtor seeks to retain Bayshore as its investment banker because of Bayshore's significant experience selling and raising capital for companies. In addition, Bayshore's principals have extensive experience providing services to companies that are financially distressed and operating under the protection of the Bankruptcy Code. Accordingly, the Debtor believes that Bayshore is well qualified to assist and advise in matters relating to the possible capital raise or sale of the Debtor's assets.

7.      The Debtor believes that it is in the best interest of the estate to employ Bayshore as the Debtor's exclusive investment banker.

8.      To the best of the Debtor's knowledge, information and belief, Bayshore: (a) does not have any connection with the Debtor, its affiliates, its creditors, this Court, the United States trustee, any person employed in the Office of the United States Trustee, any other party in interest, or their respective attorneys and accountants; (b) is a "disinterested person" as that term is defined in § 101(14) of the Bankruptcy Code; and (c) does not hold or represent any interest adverse to the estate with respect to the matters on which Bayshore is to be employed.

## **Terms of Retention**

9.     The Debtor believes that the terms of by Bayshore's retention are consistent with those of other similarly situated investment banking firms.  As more fully described in the Engagement Agreement, the Debtor and Bayshore negotiated the following arrangement for payment for services rendered by Bayshore:

> h.    Initial Fee:  The Company shall pay and Bayshore shall earn a non-refundable fee of $50,000 (the "Initial Fee").  The Initial Fee will be credited against the payment of the Transaction Fee (as defined in subparagraph 3(b)(ii)) paid to Bayshore hereunder, but shall not be credited against the Minimum Transaction Fee.  The Initial Fee shall be deemed earned upon execution of this Agreement[5] in consideration of Bayshore's accepting this engagement.

> i.    Transaction Fee:  A nonrefundable cash fee (the "Transaction Fee") deemed earned upon the closing of a Transaction, and payable immediately and directly from the proceeds of such Transaction, as a necessary and reasonable cost, and condition precedent, of such Transaction, equal to the **greater of** the following:

> > i)    $250,000 (the "Minimum Transaction Fee"); or

> > ii)   3.5% of the Consideration (as defined in subparagraph 3(c) below) Consideration.

10.     Bayshore will also seek reimbursement of certain expenses in accordance with the Engagement Agreement.[6]

11.     The overall compensation structure described above is comparable to compensation generally charged by investment banking firms of similar stature to Bayshore and for comparable engagements, both in and out of court.  The Debtor believes that the restructuring expertise of Bayshore's principals as well as their capital markets knowledge, financing skills

---

[5] All capitalized terms herein shall have the meaning ascribed to them in the Engagement Agreement dated April 1, 2009.  In the event of any conflict between this Application and the Engagement Agreement, the Engagement Agreement shall control.

[6] Expenses shall not exceed $7,500 without the prior consent of the Debtor.

and substantial mergers and acquisitions capabilities - some or all of which may be required by the Debtor during the term of Bayshore's engagement - are important factors in determining the reasonableness of their fees.  Moreover, Bayshore's expertise demonstrates that the ultimate benefit to the Debtor of Bayshore's services cannot be measured solely by reference to the number of hours to be expended by Bayshore's professionals.  Further, the times pressures of this case will require the devotion of substantial resources and may foreclose other opportunities for Bayshore.

12.    To the best of the Debtor's knowledge, information and belief, no promises have been received by Bayshore or any member, counsel, or associate of Bayshore, as to compensation in connection with these cases other than in accordance with the Engagement Agreement and the Bankruptcy Code.  To the best of the Debtor's knowledge, information and belief, Bayshore has no agreement with any other entity to share with such entity compensation received by Bayshore in connection with this chapter 11 case.

**Basis For Relief**

13.    Section 327(a) of the Bankruptcy Code provides that a debtor, subject to Court approval:

> may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor] in carrying out the [debtor's] duties under this title.

11 U.S.C. § 327(a).

14.    Section 328(a), in turn, provides that employment of a professional person under § 327 of the Bankruptcy Code:

> may be "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis."

5

11 U.S.C. § 328(a).

15.    Rule 2014 of the Bankruptcy Rules requires that an application for retention include:

> [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the [firm's] connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. Proc. 2014.

16.    The Debtor submits that Bayshore satisfies the above statutory criteria and that the fee arrangement set forth in the Engagement Agreement is reasonable under 11 U.S.C. § 328(a) and that Bayshore's compensation shall not be subject to the standard of review under 11 U.S.C. § 330.   As such, Bayshore should be retained to provide investment-banking services to the Debtor during the pendency of these cases and its proposed fee structure should be approved under 11 U.S.C. § 328(a).

WHEREFORE, the Debtor respectfully requests entry of an order authorizing the Debtor to employ and retain Bayshore as the exclusive investment banker for the Debtor in accordance

with the terms of the Engagement Agreement, and granting such other, in the form attached

hereto as Exhibit C and further relief as is just and proper.

Dated: April 3, 2009                      Respectfully submitted,
                                          DM Industries, Ltd.


                                          By:    /s/ Alan L .Goldberg
                                                 Alan L. Goldberg
                                                 Proposed Chief Restructuring Officer
                                                 For the Debtor

7

# EXHIBIT "A"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

DM INDUSTRIES, LTD.,                                    Case No. 09-15533-BKC-LMI
                                                        Chapter 11 Case

                        Debtor.
_____/

**AFFIDAVIT OF MICHAEL F. TURNER IN SUPPORT OF THE DEBTOR'S
APPLICATION FOR ENTRY OF AN ORDER AUTHORIZING THE
EMPLOYMENT AND RETENTION OF BAYSHORE PARTNERS, LLC AS
INVESTMENT BANKER TO THE DEBTOR**

STATE OF FLORIDA              )
                              )    ss.
COUNTY OF DADE                )

        Michael F. Turner, being duly sworn, deposes and says:

        1.      I am over the age of eighteen and if called upon to testify to the following could and would do so based upon my personal knowledge.

        2.      I am a Partner at Bayshore Partners, LLC ("Bayshore"),[1] and am duly authorized to submit this Affidavit on behalf of Bayshore (the "Affidavit").  Bayshore, in connection with its affiliate Farlie Turner & Co., LLC ("Farlie Turner"), provides investment banking services from an office located in Fort Lauderdale, Florida.  This Affidavit is submitted in support of the Application of the above-captioned debtor and debtor in possession (collectively, the "Debtor") in this chapter 11 case for an order authorizing the employment and retention of Bayshore as investment banker to the Debtor.

---

[1] Bayshore is the licensed broker dealer and an affiliate of the investment bank, Farlie, Turner & Co., LLC.  For purposes of this Declaration, all representations regarding Bayshore shall incorporate by reference Farlie Turner.

3.      This Affidavit is also submitted as the statement required pursuant to sections 328(a) and 504 of title 11, United States Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code") and Rules 2014(a) and 2016(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.      Except as set out below, neither I, nor Bayshore or Farlie Turner, nor any officer of the firm, insofar as I have been able to ascertain, has any connection with the Debtor in their chapter 11 case, or any interest materially adverse to the interest of any class of creditors or equity security holders by reason of any direct or indirect relationship to the Debtor, or their twenty largest creditors, or any other parties in interest herein, or their respective attorneys with respect to the matter on which Bayshore is being retained.

5.      Bayshore, with a focus on middle market companies, provides a range of merger and acquisition, private placement, and financial advisory services.

6.      Bayshore has agreed to provide investment-banking services to Debtor in their chapter 11 case before this Court, pursuant to the terms and conditions of the engagement agreement between the Debtor and Bayshore, dated April 2, 2009 (the "Engagement Agreement").  Among other things, the Engagement Agreement provides that the Debtor shall indemnify Bayshore against any and all losses, claims, damages or liabilities to which Bayshore may become subject in connection with services provided pursuant to the Engagement Agreement.  The Debtor shall pay Bayshore's fees and expenses, including counsel fees, as they are incurred in defending any such claim.  In a case where it has been determined in a final judgment by a court of competent jurisdiction that the claim resulted from the gross negligence or willful misconduct of Bayshore, Bayshore shall repay the Debtor for any fees and expenses advanced by the Debtor pursuant to the preceding sentence.

7.      Some of Bayshore's present and future employees may have, or may in the future have, personal investments in funds or other entities, over whose investment decisions such employees have no input or control, that may have made, or may in the future make, investments in the Debtor's securities, or those of their creditors, or other parties in interest in these cases.

8.      Based on the results of the foregoing, Bayshore is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code in that Bayshore:

(a)      is not a creditor, equity security holder, or insider of the Debtor;

(b)      is not and was not within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(c)      does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or for any other reason.

9.      No agreement presently exists to share any compensation received by Bayshore for its services with any other person or firm, other than to compensate the employees and shareholders of Bayshore and Farlie Turner.  If any such third-party agreement is entered into, Bayshore undertakes to amend and supplement this Affidavit to disclose the terms of any such agreement.

10.      To the best of my knowledge, Bayshore has not represented the Debtor's creditors, equity security holders, or any other parties in interest, or their respective attorneys and accountants, the United States trustee, or any person employed in the Office of the United States Trustee, in any matters relating to the Debtor or its estate.  Neither I, nor Bayshore, nor any other officer of the firm, insofar as I have been able to ascertain, represents any interest adverse to the Debtor herein, or its estate in the matters upon which Bayshore is to be

engaged.    Bayshore and Bayshore's personnel may have business associations with certain creditors and professional advisors to the Debtor' estates unrelated to this Chapter 11 case.    In addition, in the ordinary course of business, Bayshore may engage counsel or other professionals in unrelated matters that now represent, or may in the future represent, creditors or other interested parties in these cases.    The Head of Farlie Turner & Co.'s Special Situation Group, Steven Zuckerman, was previously an associate at Berger Singerman, P.A., the Debtor's restructuring counsel.    Bayshore believes that these ordinary business relationships in unrelated matters, and Mr. Zuckerman's former association with Berger Singerman, does not create any adverse interest regarding the Debtor and will not impair Bayshore's ability to perform professional services as proposed in the Engagement Agreement.

11.    To the best of my knowledge, information and belief, Bayshore is disinterested and holds no materially adverse interest as to the matters upon which Bayshore is to be retained.    To the extent I discover any facts bearing on the matters described herein during the period of Bayshore's retention, I will supplement the information contained in this Declaration.

12.    I am generally familiar with the Bankruptcy Code, and the Bankruptcy Rules, and Bayshore will comply with them, subject to the Orders of this Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 2 day of April , 2009.

Michael F. Turner

SWORN TO and subscribed before me this 2 day of April , 2009

Notary Public



CAROLE ANN HAMER
Notary Public - State of Florida
My Commission Expires Nov 21, 2010
Commission # DD 616823
Bonded Through National Notary Assn.

# EXHIBIT "B"

# BAYSHORE PARTNERS, LLC

**CONFIDENTIAL**

April 2, 2009

DM Industries, Ltd
2320 NW 147th St
Opa Locka, FL 33054

**Attention:**   Alan Goldberg, Chief Restructuring Officer

Dear Mr. Goldberg:

This letter will confirm the understanding and agreement (the "Agreement") between Bayshore Partners, LLC ("Bayshore")[1] and DM Industries, Ltd. and all of its affiliates and subsidiaries, including Central Farms, Ltd., or any entity formed for the purposes of a Transaction related to these companies (collectively referred to as the "Company" or the "Debtor") as follows:

1.    Scope of Engagement

The Company hereby engages Bayshore as its exclusive financial advisor in connection with a possible Transaction (as defined below). If requested by the Company, in accordance with the terms of this Agreement, Bayshore shall:

   (a)    Undertake, in consultation with the Company and its advisors, a study and analysis of the business, operations, financial condition and prospects of the Company and its ability to restructure;

   (b)    Assist the Company in preparing descriptive materials to be provided to potential parties to a Transaction, which material shall be reviewed for accuracy and completeness, and approved in writing, by the Company;

   (c)    Assist in identifying and screening potential parties to a Transaction;

   (d)    Assist in soliciting and evaluating preliminary and final proposals received regarding a Transaction;

   (e)    Assist in structuring a Transaction and negotiating definitive documentation for the Transaction;

   (f)    Negotiating with key creditors and other constituents as it relates to a Transaction as requested by the Company and its advisors; and

   (g)    Participating in court hearings to the extent requested by the Company and its advisors.

---

[1] Bayshore Partners, LLC is the broker dealer affiliate of Farlie, Turner & Co., LLC.

401 E. Las Olas Blvd., Ste 1160 • Fort Lauderdale, FL 33301 • P. 954.358.3800 • F. 954.358.3838

DM Industries, Ltd.
April 2, 2009
Page 2

2.    Definition of Transaction

For the purposes of this Agreement, "Transaction" shall mean one or more transactions involving the sale, transfer or other disposition of all or a portion of the assets, stock or securities of the Debtor to any entity including, without limitation, any of the Company's existing owners, shareholders, employees, creditors, lenders or affiliates; any exchange or tender offer, merger, consolidation, purchase, sale or other business combination involving the Debtor; or any recapitalization, debt refinancing, reorganization, restructuring, confirmed Chapter 11 Plan, joint venture, issuance of new securities, partnership, minority investment or other similar transaction (including, without limitation, negotiated repurchases of the Company's securities, an issuer tender offer, an extraordinary dividend or distribution, a credit bid, or a spin-off, split-off or debt restructuring), regardless of whether the Debtor is the surviving corporations or entities.

3.    Compensation

As compensation for the services rendered by Bayshore hereunder, the Company shall pay Bayshore as follows:

(a)    Initial Fee:  The Company shall pay and Bayshore shall earn a non-refundable fee of $50,000 (the "Initial Fee").    The Initial Fee will be credited against the payment of the Transaction Fee (as defined in subparagraph 3(b)(ii)) paid to Bayshore hereunder, but shall not be credited against the Minimum Transaction Fee.  The Initial Fee shall be deemed earned upon execution of this Agreement in consideration of Bayshore's accepting this engagement.

(b)    Transaction Fee:  A nonrefundable cash fee (the "Transaction Fee") deemed earned upon the closing of a Transaction, and payable immediately and directly from the proceeds of such Transaction, as a necessary and reasonable cost, and condition precedent of such Transaction, equal to the **greater of** the following:

        i)      $250,000 (the "Minimum Transaction Fee"); or

        ii)     3.5% of the Consideration (as defined in subparagraph 3(c) below)
Consideration.

Consideration shall be calculated based on the aggregate cash and non-cash consideration paid or debt assumed, or to be paid or assumed, irrespective of the number of Transactions or tranches of Transactions.

(c)    "Consideration" shall mean the total value of all cash, securities, repurchase or buy-out of any stock options or warrants, property and any other consideration paid or payable, directly or indirectly, in connection with a Transaction, including, without limitation, consideration paid or payable to, or for the benefit of, the Company or to any security holder of the Company, including any

DM Industries, Ltd.
April 2, 2009
Page 3

consideration held in escrow, future payments which are contingent upon the performance of the Company or any successor to the Company, and any dividends or distributions paid to the holders of the Company's equity securities after the date hereof, other than usual recurring cash dividends in amounts not materially greater than currently paid, or any other consideration paid or payable, directly or indirectly, in connection with a Transaction. Any consideration held pursuant to an escrow account established before or in connection with the consummation of a Transaction shall be deemed Consideration hereunder irrespective of whether such consideration is being held in escrow to satisfy future claims. If the Transaction provides for the transfer of only a portion of the assets or business of the Company and the retention of other assets relating to such entity or business, including, but not limited to, cash, cash equivalents, real property, leasehold interests, securities, investments, inventories or receivables, such retained assets shall be deemed to be part of the Consideration received in connection with such a Transaction. If the Transaction provides for the transfer of only a portion of the capital stock or comparable equity interests of the Company, then the value of the capital stock or equity interests not transferred shall also be deemed to be a part of the Consideration, and the value thereof shall be based on the same value per share or other unit as used in the Transaction. The value of any securities constituting part of the Consideration (whether debt, equity, stock options, stock warrants or other equity equivalents) or other property shall be determined as follows: (i) the value of securities that are freely tradeable in an established public market shall be the average of the last sale prices for such securities on the five trading days ending one day prior to the consummation of the Transaction (the "Closing"); and (ii) the value of securities which are not freely tradeable or which have no established public market, or if the consideration consists of property or contingent payments other than securities, the value of such securities, other property, or contingent payments shall be the fair market value thereof as mutually agreed by the Company and Bayshore. Consideration shall also be deemed to include any indebtedness assumed, directly or indirectly, or any indebtedness forgiven or any indebtedness restructured, directly or indirectly, in connection with, or which survives the closing of, the Transaction, including, without limitation, capitalized lease obligations, secured and unsecured debt, guarantees and other obligations.

If the parties are not able to agree on a fair market valuation of the Consideration prior to Closing, then within five days after Closing, the parties will mutually select one independent accounting firm to determine the fair market value. If the parties are unable to agree on an independent accounting firm, then each party will select one independent accounting firm and both of these firms will then select one nationally recognized independent accounting firm (the "Neutral Auditor"). The Neutral Auditor will determine the fair market valuation of the Consideration and such determination shall be final, binding, and conclusive. All fees and expenses relating to the selection of accounting firms pursuant to subparagraph 3(c) and work performed by the Neutral Auditor shall be borne equally by the parties to this Agreement.

DM Industries, Ltd.
April 2, 2009
Page 4

(d)     Except for compensation which is payable to Bayshore in respect of Consideration which is contingent upon the occurrence of some future event (*e.g.*, the realization of earnings projections), compensation payable to Bayshore pursuant to subparagraph 3(b) shall be paid by the Company to Bayshore in wired funds at Closing from the Transaction proceeds.  With respect to compensation payable to Bayshore in respect of contingent Consideration, such compensation shall be paid by the Company to Bayshore at the time that the amount of such Consideration can be determined.   The Company agrees that the definitive agreements relating to a Transaction will contain a covenant stating that the Transaction Fee payable to Bayshore pursuant to subparagraph 3(b) will be paid at the Closing, except as provided herein, and that the surviving or acquiring entity of any Transaction is responsible for all fees and expenses due Bayshore. The Transaction Fee shall be subject to Court approval under Section 328(a) of the Bankruptcy Code, however, Bayshore shall not be required to maintain time records or file fee applications with the Court.

4.     Reimbursable Expenses

In addition to any fees payable to Bayshore hereunder and regardless of whether a Transaction is consummated, the Company shall reimburse Bayshore for its out-of-pocket and incidental expenses incurred in connection with its engagement hereunder promptly as requested, including the fees and expenses of its legal counsel and those of any advisor retained by Bayshore, which expenses shall not exceed $7,500 without the prior consent of the Company and provided that such limitation shall in no way affect the obligations of the Company with respect to indemnification as set forth on Exhibit A attached hereto.

5.  Coordination

In order to coordinate the parties' efforts with respect to a Transaction, during the period of Bayshore's engagement hereunder, neither the Company, its management, its advisors, or any other representative of the Company will initiate or solicit any discussions or offers related to a possible Transaction, directly or indirectly, with prospective parties to the Transaction, without the express written consent of Bayshore.   The Company and its advisors and Bayshore each will inform and consult with the other on a regular basis regarding any inquiries or proposals received from potential parties to a Transaction.

6.  Indemnification

Because Bayshore will be acting for the benefit of the Company in connection with this engagement, the Company agrees to indemnify Bayshore and certain other persons as set forth in the indemnification provisions attached hereto as Exhibit A, the provisions of which are incorporated herein in their entirety.   The indemnification provision will survive termination of this Agreement.

7.  Company's Responsibilities, Representations and Warranties

DM Industries, Ltd.
April 2, 2009
Page 5

In connection with Bayshore's engagement, the Company will furnish Bayshore with all information which Bayshore reasonably requests and will provide Bayshore with access to the Company's officers, directors, accountants, legal counsel and other advisors. The Company represents and warrants to Bayshore that: (a) all such information is and will be true and accurate in all material respects on the date it is given to Bayshore and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (b) any projected financial information or other forward looking information which the Company provides to Bayshore will be made by the Company in good faith, based on management's best estimates then available and based on facts and assumptions which the Company believes to be reasonable. The Company acknowledges and agrees that Bayshore will be using and relying upon such information supplied by the Company and its officers, agents and others and any other publicly available information concerning the Company and any prospective Transaction party without any independent investigation or verification thereof or independent appraisal by Bayshore of the Company or its business or assets or any other Transaction party or its business or assets. If any information provided to Bayshore by the Company becomes inaccurate, incomplete or misleading in any material respect during Bayshore's engagement hereunder, the Company shall so advise Bayshore. The Company shall provide Bayshore with any updates regarding any material change to the Company's business.

8.  Other Terms and Conditions

The Company further represents and warrants to Bayshore that:

(a)     The Company has taken no action that would give any brokers, representatives, finders or other persons an interest in the compensation due to Bayshore in connection with any Transaction contemplated herein;

(b)     This Agreement does not violate or constitute a breach or default under any charter document, contract, agreement, arrangement or understanding, whether written or oral, to which the Company or any of its subsidiaries is a party or by which its or their assets are bound. The Company has the corporate authority, ability, and authorization to enter into this Agreement.

9.  Application for Retention

Bayshore's obligation to provide the services described herein are subject to approval of this agreement and Bayshore's retention pursuant to sections 327 and 328(a) of the Bankruptcy Code and review under Section 328(a) and not Section 330 of the Bankruptcy Code, and is also contingent upon, and expressly subject to, the execution of a waiver, subordination, carve-out, or similar agreement, in form and substance satisfactory to Bayshore pursuant to which the Company's secured lenders consent to the performance of the Company's obligations under this Agreement, including, without

DM Industries, Ltd.
April 2, 2009
Page 6

limitation, the Company's payment of Bayshore's fees and expenses described herein, free and clear of such lenders' security interests in the Company's assets. In agreeing to seek approval of Bayshore's retention under section 328(a) of the Bankruptcy Code, the Company acknowledges and agrees that Bayshore's restructuring expertise and experience will inure to the benefit of the Company, that the value of the services to be provided hereunder derive substantially from such expertise and experience and that the fees provided for herein are reasonable regardless of the number of hours expended by Bayshore in performance of services hereunder.

10. Disclosure to Third Parties

Except as required by law, or pursuant to order of a court of competent jurisdiction, no written or oral advice provided by Bayshore pursuant to this Agreement shall be disclosed, in whole or in part, to any third party, or circulated or referred to publicly, without the prior written consent of Bayshore. The fact of Bayshore's engagement hereunder may be disclosed to prospective parties to a Transaction, but the Company may not publicly announce or advertise Bayshore's engagement without the prior consent of Bayshore.

In the event of consummation or public disclosure of any Transaction, Bayshore shall have the right to disclose its participation in such Transaction, including, without limitation, the placement at its cost of "tombstone" advertisements in financial and other newspapers and journals.

11.    Successors and Assigns

The benefits of this Agreement, together with the separate indemnity agreement, shall inure to the respective successors and permitted assigns of the parties hereto and of the indemnified parties under such indemnity agreement and their respective successors, permitted assigns and representatives, and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon their respective successors and assigns. Notwithstanding the foregoing, this Agreement and the related indemnity agreement may not be assigned without the prior written consent of the nonassigning party (or parties).

12.    Amendment or Modification

This Agreement may not be amended or modified except in writing signed by both parties and shall be governed by and construed in accordance with the laws of the State of Florida, without regard to its principles of conflicts of laws.

13.    Arbitration of Disputes

Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration

DM Industries, Ltd.
April 2, 2009
Page 7

Association in accordance with the Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) shall be entered in any court having jurisdiction over such matters. Within fifteen (15) days after the commencement of arbitration, the Company and Bayshore shall each select one person to act as an arbitrator and the two selected arbitrators shall select a third arbitrator within ten (10) days of their appointment. If the two arbitrators selected are unable or fail to agree upon the third arbitrator, the third arbitrator shall be selected by the American Arbitration Association. The place of arbitration shall be in Broward County, Florida. This Agreement shall be governed by the laws of the State of Florida, without giving effect to the principles of conflicts of laws. The arbitrators shall award to the prevailing party, if any, as determined by the arbitrators, all of its costs and fees. "Costs and fees" shall mean all reasonable pre-award expenses of the arbitration, including the arbitrators' fees, administrative fees, travel expenses, out-of-pocket expenses, such as copying and telephone, court costs, witness fees and attorneys' fees. Except as may be required by law, neither a party to this Agreement nor an arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of both parties. The award of the arbitrators shall be in writing, shall be signed by a majority of the arbitrators, and shall include a statement regarding the reasons for the disposition of any claim.

14. Limitation of Bayshore's Engagement to the Company

The Company acknowledges that Bayshore has been retained only by the Company, that Bayshore is providing services hereunder as an independent contractor (and not in any fiduciary or agency capacity) and that the Company's engagement of Bayshore is not deemed to be on behalf of, and is not intended to confer rights upon, any shareholder, owner or partner of the Company or any other person not a party hereto as against Bayshore or any of its affiliates, or any of its or their respective officers, directors, controlling persons (within the meaning of Section 15 of the Act or Section 20 of the Securities Exchange Act of 1934), employees or agents. Unless otherwise expressly agreed in writing by Bayshore, no one other than the Company is authorized to rely upon this engagement or any other statements or conduct of Bayshore, and no one other than the Company is intended to be a beneficiary of this Agreement. The Company acknowledges that any recommendation or advice, written or oral, given by Bayshore to the Company in connection with Bayshore's engagement is intended solely for the benefit and use of the Company's shareholders and directors in considering a possible Transaction, and any such recommendation or advice is not on behalf of, and shall not confer any rights or remedies upon, any other person or be used or relied upon for any other purpose.

15.   Termination

(a) Bayshore's engagement hereunder shall terminate one year from the date hereof unless terminated earlier by either party by giving at least ten (10) days prior written notice to the other party. Notwithstanding the foregoing, this Agreement may not be canceled by either party within the first sixty days after its execution

DM Industries, Ltd.
April 2, 2009
Page 8

without cause. Following the initial sixty day period, either party may terminate without cause.

(b) The Transaction Fee payable by the Company shall also be payable in the amount and at the time set forth in paragraph 3 if the Company announces or enters into an agreement with respect to a Transaction at any time during a period of twelve (12) months following the Effective Date of termination of Bayshore's engagement hereunder. A termination of this agreement does not alter the Company's obligations to indemnify Bayshore pursuant to paragraph 6 of this Agreement

16.    Survival of Terms of Agreement

The provisions of this Agreement (including subparagraph 14(b)), other than paragraphs 1 and the first sentence of paragraph 7, shall survive and remain in full force and effect notwithstanding any termination of Bayshore's engagement under paragraph 14 of this Agreement or otherwise.

DM Industries, Ltd.
April 2, 2009
Page 9

In acknowledgment that the foregoing correctly sets forth the understanding reached by Bayshore and the Company, please sign in the space provided below, whereupon this letter shall constitute a binding Agreement as of the date indicated above.

Very truly yours,

BAYSHORE PARTNERS, LLC

By: _____

Name: _Michael Turm_____

Title:
_Partner_____

Accepted and Agreed:

**DM Industries, Ltd.**

By: _____

Dated: _____

Accepted and Agreed:

**Central Farms, Ltd.**

By: _____

Dated: _____

DM Industries, Ltd.
April 2, 2009
Page 10

## EXHIBIT A

In connection with Bayshore's engagement to advise and to assist the Company pursuant to the Agreement dated April 2, 2009, which this Exhibit A is attached, the Company agrees to indemnify and to hold harmless Bayshore and each of its affiliates, and their respective officers, directors, controlling persons (within the meaning of Section 15 of the Securities Act of 1933 or Section 20 of the Securities Exchange Act of 1934), employees, affiliates, agents, counsel and other advisors (hereinafter collectively referred to as an "Indemnified Party"), to the fullest extent allowed by law or equity, from and against any and all judgments, losses, claims (whether or not valid), damages, costs, fees, expenses or liabilities, joint or several, to which an Indemnified Party may become subject, related to or arising out of Bayshore's engagement or performance under the Agreement, the transaction contemplated thereby, the services rendered by Bayshore under the Agreement, or any actual or threatened claim, litigation, investigation, proceeding or action in any court or before any regulatory, administrative or other body relating to any of the foregoing (hereinafter referred to collectively as a "Claim"), and shall, upon request, reimburse an Indemnified Party for all legal and other costs, fees and expenses as they are incurred in connection with investigating, preparing or defending a Claim, whether or not such Indemnified Party is ever made party to any legal proceedings or such Claim arose before or after the date hereof; provided, however, that no such indemnification shall be required to be paid to an Indemnified Party with respect to a Claim that is finally determined by a court of competent jurisdiction (after exhaustion of all appeals) or in an arbitration conducted in accordance with this Agreement to have resulted solely from the gross negligence or willful misconduct of such Indemnified Party.

In the event that the foregoing indemnity is unavailable or insufficient for any reason (other than by reason of the terms hereof) to hold any Indemnified Party harmless, then the Company shall contribute to any amounts paid or payable by an Indemnified Party in such proportion as appropriately reflects the relative benefits received by such Indemnified Party and to the Company in connection with the matters to which the Claim relates. If an allocation solely on the basis of benefits is judicially determined to be impermissible, then the Company shall contribute in such proportion as appropriately reflects the relative benefits and relative fault of the Company and such Indemnified Party, as well as any other equitable considerations. In no event shall the Company contribute less than the amount necessary to ensure that the aggregate liability of Bayshore and any other Indemnified Party for contribution pursuant to this paragraph in connection with all Claims does not exceed the amount of fees actually received by Bayshore under the Agreement. For purposes hereof, relative benefits to the Company and Bayshore of the Transaction shall be deemed to be in the same proportion that the total value received or contemplated to be received by the Company and/or its security holders in connection with the Transaction bears to the fees paid to Bayshore under the Agreement in respect of such Transaction, and other relative fault of each Indemnified Party and the Company shall be determined by reference to, among other things, whether the actions and omissions to act were by such Indemnified Party or the Company and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such action or omission.

All amounts due to an Indemnified Party hereunder shall be payable by the Company

DM Industries, Ltd.
April 2, 2009
Page 11

promptly upon request by such Indemnified Party. In addition, the Company agrees to pay all costs and expenses (including attorneys' fees) incurred by an Indemnified Party to enforce the terms of this Exhibit A.

The Company agrees not to enter into any waiver, release or settlement of any Claim (whether or not Bayshore or any other Indemnified Party is a formal party to such Claim) in respect of which indemnification may be sought hereunder without the prior written consent of Bayshore (which consent will not be unreasonably withheld), unless such waiver, release or settlement includes an unconditional release of Bayshore and each Indemnified Party from all liability arising out of such claim.

The provisions of this Exhibit A shall be in addition to any liability which the Company may otherwise have to Bayshore; shall not be limited by any rights that Bayshore or any other Indemnified Party may otherwise have; shall remain in full force and effect regardless of the expiration or any termination of Bayshore's engagement; and shall be binding upon any successors or assigns of Bayshore and the Company.

# EXHIBIT "C"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

DM INDUSTRIES, LTD.,                          Case No. 09-15533-BKC-LMI
                                              Chapter 11 Case

                Debtor.

_____/

### ORDER GRANTING DEBTOR'S APPLICATION FOR AUTHORITY TO RETAIN BAYSHORE PARTNERS, LLC AS INVESTMENT BANKER TO THE DEBTOR

**THE MATTER** having come before the Court on the _____ day of _____, 2009 at

_____ a.m./p.m. in Miami, Florida upon the *Debtor's Application for Order Authorizing the*

*Employment and Retention of Bayshore Partners, LLC* ("Bayshore") as investment banker to the

Debtor (the "Application"), filed by the above-captioned debtor in possession (the "Debtor"); the

Court having reviewed the Application, the engagement agreement dated April 1, 2009 (the

"Engagement Agreement"), and the Affidavit of Michael F. Turner (the "Turner Affidavit"); the

Court finding that: (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334

and reference from the District Court pursuant to 28 U.S.C. § 157; (b) notice of the Application

was sufficient under the circumstance; (c) Bayshore is a "disinterested person" pursuant to

8

Section 101(14) of the Bankruptcy Code; and (d) the legal and factual bases set forth in the Application and the Turner Affidavit establish just cause for the relief granted herein; the Court hereby approves of the retention of Bayshore on the terms as set forth on the record and below;

**IT IS HEREBY ORDERED THAT:**

1.     The Application, which incorporates by reference all of the terms Engagement Agreement is GRANTED.

2.     Capitalized terms not otherwise defined herein have the meanings given to them in the Application or the Engagement Agreement, as the case may be.

3.     The Debtors are authorized to retain and employ Bayshore as investment banker in these chapter 11 cases, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014, 2016 and 5002 and the terms set forth in the Application.

4.     Bayshore shall be compensated for such services and reimbursed for any related expenses, with such expenses being disclosed to the Court at such time as the amount of the Transaction Fee is approved by the Court, in accordance with section 328(a) of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and any other applicable orders of this Court.  Bayshore shall not be required to file fee applications nor maintain time records in accordance with the Guidelines for Fee Applications for Professionals in the Southern District of Florida in bankruptcy cases.

5.     Notwithstanding any agreement(s) between the Debtor and Comerica Bank or Order of this Court relating to the enforceability, priority or security of any pre-petition or post-petition claim (whether of the Debtor's pre- or post-petition lenders or otherwise), the lender(s) or claimant(s) right to payment of their debt (whether principal, interest or other costs or charges), and any other recovery of their claims against the Debtor, their assets and any proceeds

9

2054212-1

thereof, shall be fully subordinate to the payment in full and in cash, of all fees and expenses due

Bayshore under the Engagement Agreement.  Further, any Transaction Fee payable pursuant to

the Engagement Agreement shall be paid from the proceeds the Transaction (as a cost of such

Transaction) free and clear of any lien, claim or interest that any creditor or claimant may

possess in the relevant assets sold or the proceeds received in connection with such Transaction.

# # #

Submitted by:
Douglas A. Bates, Esq.,
BERGER SINGERMAN, P.A.
200 S. Biscayne Blvd., 10th Floor
Miami, FL 33131
Tel: 305-755-9500
Fax: 305-714-4340
dbates@bergersingerman.com

Copy furnished to:
Douglas A. Bates, Esq.
*(Attorney Bates is directed to serve a conformed copy of this Order upon all interested
parties, and to file a Certificate of Service with the Court)*.

10

2054212-1